I'm Andrew Martin. I represent the appellants in both of these cases, James and Will, myself in the B P X matter and the named plaintiffs in the Johnson v. Chesapeake matter. I'm happy to discuss with the court to the extent I'm asked the issues peculiar to each case, but my main goal today is to give an overview of the common legal errors in both cases made by the district court, of which I see two. In summary, they are first the district court in effect disregarded the plain language of the only statutory provision in Louisiana which sets forth the payment basis of an unleased owner by the operator of the unit well and of course per unit. That's Louisiana Revised Statute 3010, Section A3. Can you try to be a little louder? Sure thing, Your Honor. Is that better? Yes. Section A3 of 3010 sets forth a proceeds basis of payment. It's to be contrasted with, for instance, a market value basis that you just heard about in the Texas Hillcourt case. The district court decision read out this proceeds basis and substituted in its place a market value or a netback valuation. This was erroneous. The second main legal error by the district court was to ignore the plain text of Civil Code Article 2292, which defines the relationship of negotiorum gestio, Louisiana's doctrine of a voluntary good-faith agent. The district court rationality rationale effectively enshrined unit operators as du jour gestors. This was contrary to the restitution of gestio. If affirmed, the district court's errors potentially have far-reaching consequences that go well beyond the payment issue in this case because the district court's reasoning threatens to undermine the basis of forced pooling law as an autonomous area of law with its own specific statutory directives aimed at achieving specific conservation-related policy goals and undermining, as well, the concept of gestor as a voluntary . . . You're referring to policy goals. As I understand it, what you're saying ultimately is that in terms of these forced pooling arrangements, it's fine to deduct production costs. It's not fine to deduct post-production costs. For unlaced owners, yes, Your Honor. What's the policy reason why the Louisiana legislature would want to allow one type of the other? The one type . . . The other day, all the costs are borne by the producers. Why isn't that a fair thing to distribute on both fronts? The production costs are specifically defined in Section 8-2, and they're applicable to all owners in a forced pool unit, including leased . . . I'm not making a law point. You referred to policy, so I'm happy to at least entertain you as far as that goes. What is the reason why we should read the statute and why the lawmakers would have written the statute to say it's fair to deduct one type of cost that is completely unfair to deduct another type of cost? I think the policy question of why the legislature did this is an interesting one. It's because, I think, unleased owners, as a particular subclass of unit owners distinct from leased position. They are smaller. They cannot negotiate their own independent arrangements. They have no control. Isn't that true of both production costs and post-production costs? It is. Either way, it's forced pooling. It is forced pooling. You're right. And for me . . . My question is, if we're going to sort of create this fictional arrangement, why allow pro rata taxing of production costs but not post-production costs? Because I take it that's your argument. My argument is Section 8.3 provides a payment basis, a calculation based on proceeds. And because proceeds is a payment basis, implicitly disallows anything that . . . Right, but you're aware we read all this against the backdrop of pre-existing Louisiana law. That's right. In pre-existing Louisiana law . . . Trying to figure out why would the legislature want to bump out pre-existing reimbursement for post-production as well as production. I don't think there was pre-existing law as to unleased owners as a particular subclass. They were pulled out of the morass of uncertainty, as the district court originally said in the Johnson matter here. There is uncertainty still about the payment basis for leased owners, lessees who negotiate leases with mineral owners in a forced pooling unit. They have a different payment basis, and it's not one that's specifically explicated in Section 8.3. They are still out there. The Louisiana legislature was free to provide a different payment basis for a different type of owner. An owner who has different negotiating power, essentially a mill, has no oversight ability, did not voluntarily get into the oil and gas business as leased owners did. And the question of whether they should have done this, whether the legislature should have provided a proceeds basis versus a market value basis, is an interesting one for legislators. And I think if the defendants in this case do not like the proceeds basis that is set forth in 8.3, particular to unleased owners, they can contact a legislator and ask the law to be changed. This happens all the time. Section 8.3 has been changed. This has not been touched. This is the compromise that our particular legislature arrived at. Every state does this differently. Forced pooling, especially with related to unleased owners who did not ask to get into the oil and gas business. Some states make this a forced leased arrangement. They provide a state lease. Some states make it half leased and half working interest. Louisiana is elected to make it so that unleased owners do not get paid from first production. They do not get paid at all until payout is achieved. What specifically do you want us to hold? I want you to reverse the district court rulings on both the 12B6 and the BPX matter. And I would like the court to reverse the grant of summary judgment in Chesapeake's favor in the Chesapeake matter. I think additionally in the Chesapeake matter, I think you have the power . . . For what reason? What would you like us to hold? It's good that you gave us what operative things would happen, but what is the holding? The holding is that the doctrine of negotiorum gestio, as set forth in Article 2292 of the Civil Code, provides a mechanism for a unit operator to get reimbursed for useful and necessary costs of post-production services out of proceeds otherwise payable to unleased owners. On the first part, it misunderstands what a proceeds basis of payment is. The unitization statutes are their own realm. They exclude by implication normal sources of law. This is something this court has noted. These are the rules for the game for the unleased owner. This is what they're allowed to rely on. And the second reason the district court got this wrong is it applied automatically an essentially fact-based inquiry of whether or not negotiorum gestio can apply in any circumstance. Negotiorum gestio depends on certain threshold fact determinations. Whether or not the manager of affairs acted with a specific intent to benefit the managed party, did so voluntarily, and did so objectively in accordance with the actual or presumed intentions of . . . What is your best case for the argument that the gesture without authority requirement includes statutory authority? That it includes statutory authority? I think the Kirkpatrick versus . . . the Kilpatrick versus Kirkpatrick case, there was a brother who, in acting, he voluntarily took on the role of succession representative, and in doing so, he got a succession settlement that was favorable to his brother. He said, well, I was acting as a gestor for my brother. And the court said, no, you took on voluntarily, yes, this statutory authority to act as a succession representative. That doesn't mean you were doing your duties that were prescribed under that statute as a gestor. You have to take an extra step. You have to go outside of what's required by the statute, even if you took that on voluntarily. There's also the intention requirement. What these defendants would need to show to . . . to establish themselves as a gestor is that they intended to benefit our clients as unleashed owners. Counsel, you started off by saying you could talk about both cases. Are there any differences such that we should be . . . treat something different between the two cases that you want to point out to us? Largely procedural. The summary judgment in the . . . go ahead. I'm sorry, go ahead. In summary judgment, there are particular fact claims that have been made in the Chesapeake matter, for instance, that have not been made in the BPX matter. The Chesapeake summary judgment record, for instance, has certain undisputed facts. Chesapeake has admitted it has not actually reported to us the actual price paid for gas in contradiction to the statutory requirement that they do so. Chesapeake has admitted, for instance, that it started off this relationship concealing information from our clients despite our clients' best efforts to elicit this information, to find out what they were getting for their money as this court says the reporting statutes are for. That wasn't the Brannan v. Chesapeake case. So Chesapeake actually, in the summary judgment, the appellate briefing here makes an interesting claim. Chesapeake says it's never been disputed that Chesapeake treated the proceeds, in this case, as belonging to my clients. It hasn't been disputed because Chesapeake, despite having a summary judgment record, hasn't even alleged that. They have not alleged that they've treated the proceeds as ours. They certainly haven't alleged that they acted in accordance with our actual or presumed intentions. They certainly haven't alleged that they wanted to benefit my clients uniquely here. These are threshold fact determinations. The only authority that either company has offered for the idea that gestio can apply automatically is dicta in a pair of Third Circuit decisions. It's the only Louisiana case law on this. Dicta in a pair of Chesapeake v. Smith and Taylor v. David New, in which the district, the appellate courts there, trying to reach a prescriptive period determination, said it's quasi-contract and it's sort of like negotiable gestio. That's it. That's not enough. That is not binding precedent in this court. What is binding precedent as to the determination of what Louisiana law on gestio is, is the Louisiana Supreme Court and the civil code articles. Louisiana Supreme Court in Kirk Patrick v. Young says there must be an intent to benefit. If there is no intent to benefit, there is no gestio relationship. Similarly, the civil code and its articles say, its comments say, if you're not acting, if you are not acting to benefit the managed party and you're in fact acting in a way that benefits you uniquely, you're an usurper. And so an interesting question that I don't think either side has answered here is, are there any fact circumstances under which these operators could have acted as usurpers? Usurption would occur in any other instance where, for instance, the relationship began without an intent to benefit and without actions that are objectively in accord. Mr. Martin, I don't want to have time to get away without me having a chance to ask you. Yes, Your Honor. Does your reading render part of 10A3 superfluous? In what way, Your Honor? Absolving your unleased mineral owners of any contributions to post-production costs allows them to, makes it superfluous because if they choose to enter their own, they can make their own market agreements. Yes, Your Honor. If they choose to make their marketing agreements, they would be responsible for the cost. That's right. So you would get free marketing whenever they contemplate that you would make marketing agreements. You were talking about the marketing agreements earlier, so this is not a surprise to you. It's not. But it seems like it cuts the other way rather than the way that you said. The legislature, when they passed Section A3 in 1984, went into law in 1985, preserved the pre-existing right applicable to all owners to market your own gas. That is a statutory option that is very rarely taken, and I acknowledge that. It's there. It's just rarely taken. There's nothing that renders... It's sort of obsolete and should be ignored? Not obsolete, Your Honor. There may be circumstances under which an unleased owner wants to take that option, just like there may be circumstances under Section A2 where an unleased owner wishes to make contributions to drilling costs, even though they face no penalty if they don't. So they get a free ride, even though they can, if they wish to, make upfront drilling contributions under A2. The fact that there are statutory options available that are rarely or never taken doesn't render any law absurd. The legislature is allowed to make accommodations for possible options that are rarely taken, and they've done that in two parts of Section A2 of 3010 at least. I see I'm out of time at this point. Let's see. Who's up next? Ms. Nolan Ogden. Mr. Roland Ogden? Ms. Roland Ogden, I'm sorry. Thank you. May it please the Court, April Roland Ogden with Lisko and Lewis on behalf of BPX and the self matter. The sole issue on the self appeal is whether it is illegal as a matter of Louisiana law to deduct any post-production costs from an unleased owner's proceeds. The plaintiffs are the masters of their pleadings, and they pled a per se illegal claim. Now what they're saying in that claim is that under no circumstances could BPX ever deduct any post-production costs as a matter of law. This is the afternoon of post-production costs. I said this is the afternoon of post-production costs. Yes, Your Honor. It absolutely is. Now as you heard from Mr. Martin, the sole basis of this argument is in fact the text of 3010. That is the risk fee statute. And as they argued below, you can't go beyond the text. I think you heard the argument that conservation is its own animal. But the problem that we believe they have with the legal sufficiency of that claim under 1206 is there is a mountain of authority, some of which they treat, most of which they don't in their briefing. And we believe that the district court correctly rejected their legal novel theory for three primary reasons. First, it is settled law that A3 under 3010 creates a quasi-contractual legal relationship. And that does not come just from the Third Circuit or just from the First Circuit. That comes from the Louisiana Supreme Court. In a decision that I did not hear mentioned, Wells v. Zadig in 2012, the Louisiana Supreme Court held a quasi-contractual relationship is created between the unit operator and the unleased mineral owner with whom the operator has not entered into a contract. Now, interestingly enough, the Third Circuit decision by Smith was also explicitly cited with approval by the Louisiana Supreme Court. But Smith went a step further than the Louisiana Supreme Court did. They actually said what the quasi-contract is. It's negotium gestor. And it's insofar as the unit operator is selling the unleased owner's share of gas. Now, the Third Circuit's not alone. The First Circuit has reached the same conclusion and has gone to the step of it being negotium gestor. And that was Taylor v. Woodpecker in 1994. Now, there is also some post-revision cases that show the law did not change after the revision of the Civil Code in 1995. And for those cases, we have King v. Shuler in 1996. That case did not involve prescription. And we also have the Western District of Louisiana in 2018 in J&L v. BHP. That case, likewise, did not involve prescription. It involved whether or not there were attorney's fees provided for under 32. The court looked to the code to answer that question. So, what we know is we've got the Louisiana Supreme Court in Wells. We've got the Third Circuit three times. And we also have intermediate courts, the only ones that have actually looked at this issue saying that it's negotium gestor. No Louisiana court has ever cast any doubt or disagreed with these rulings. And so, it's our position that this court, sitting in diversity, is eerie bound to follow this authority. When you compare this authority, which clearly says that A3 creates the relationship of negotium gestor, you at least have a strong indication of what the Louisiana Supreme Court When you say eerie bound, because of the Supreme Court case only? I'm sorry, I couldn't hear you. Are you saying because of the Supreme Court case only? I mean, because you can't say we're eerie bound because of the Third Court and the Fifth Court. We're not eerie bound because of that. Correct. They're persuasive. Even though if it's in some different sort of Louisiana system, it doesn't require us to be eerie bound on that. Absolutely. I agree that we believe that the Louisiana Supreme Court has said, and that you are bound to recognize that there is a quasi-contractual relationship created by A3. But, when you're doing an eerie analysis, you also have to consider whether or not there are intermediate courts of appeal that have also reached the same conclusion. Right, but they're only persuasive authority. They're never binding on us for eerie. But the important point is, in my opinion, the important point there is that the Louisiana Supreme Court cited that intermediate court case, which said negotium gestor. So, if you're making an eerie guess, you've got a pretty good indication what the Louisiana Supreme Court is doing. Right, because they don't have anything on their side of the ledger, and you've got a bunch of things. That's absolutely right. One of the cases that my friend on the other side mentioned was the Kirkpatrick case. So, I wanted to address that briefly. In that case, there was actually an employment contract under which the parties tried to get the relief. And that employment contract was with the clients, between the lawyers and the clients, but there were unknown heirs that they didn't know about, and that was where they tried to say, oh, we did this on your behalf, unknown heirs. And what the court said was, no, you were doing it on behalf of the clients. So, there was no contract between the parties. That's why the courts use negotium gestio to define the legal relationship that is created, is because it is an obligation that arises without agreement. That's how it's defined in the civil code. So, the second reason that we believe that the district court got this right is Article 2297. It gives a positive expression of statutory law that we are entitled, as the manager, to be reimbursed for necessary and useful expenses. And we cited in our brief why post-production costs are necessary and useful. There's well-settled Second Circuit decisions on that. Let's say we agree with you that Article 2297 supports you. What does that do to the provisions at the other side sites, the 3010A, 2, and 3? I think that it actually makes it make sense. The provisions of A3 . . . You wouldn't be reading those provisions out of the law? Absolutely not. Why not? And, in fact, I believe the district court gave a very good analysis where he was . . . Judge Hicks was able to explain that you read them together in harmony. You reconcile A3 and its reference to proceeds with the reimbursement rights. So, whether you agree that it's a proceeds basis or not, you can't ignore the 2297 reimbursement article. And that brings up another . . . If you have 2297. So, A2 regulates production costs. And A3, as we know from the Louisiana Supreme Court . . . But if you didn't have A2, I assume you'd say that 2297 does all the work you need it to do. 2297 will apply when the operator sells the unleased owner's share of gas. When that happens, that necessarily involves post-production costs. Those are necessary and useful according to the authority that we cited in our brief. Let me put it this way. If, tomorrow, the legislature repealed A2 and A3, would your position be any different? I don't believe so. Right. So, then what is . . . Because we still have a quasi-contractual relationship that occurs . . . Right. So, what is A2 and A3 doing then? If it's not doing anything in your case, it's doing something in other cases. Or, you know what? Sometimes the legislature does belt and suspenders. But, yes, technically, you don't need to have both provisions. Perfect question. So, A2 tells you what you can potentially recover against in terms of production costs. A3 merely answers the balancing question of what you have to give an unleased owner if they fail to make their own separate marketing arrangements and if the unit operator proceeds with the sale of gas. In those instances, if that happens, then what you're left with is you're told you only get cash. You don't get in-kind production. That's what A3 is telling us. And the district court correctly cited Hunt v. Batchelor by the Louisiana Supreme Court for that Woodpecker case in 1991 by the Louisiana Supreme Court. And in that case, it said that the plaintiff's, as unleased owner's, right to recovery is limited by the unit operator's right to sell under A3. So, if the unit operator sells the production, then A3 is going to apply and all they could potentially get is cash. That's what the function of A3 is. And so, with that, I'm out of time. Thank you, Your Honor. Nicole Duarte on behalf of the Chesapeake Entities in the Consolidated Johnson Action. So, I'm going to start, I'm going to jump around a little bit, and I hope that's okay, to address some of the questions that the court has raised already. In response to Judge Ho's question, what are the purposes of A2 and A3? What do they add to the game? They add a couple of things. A2, for example, adds the concept of the risk charge, which is something that is different from expenses of production. It's something that says if you don't participate in the well, not only do you have to pay your share of the expenses of drilling out of production, but you also have to pay a risk charge, so that's basically compensating the operator for the risk that it undertakes. That's not applicable. That risk charge is not applicable to a true UMO, but it's in A2, along with the other charges. A3 does two things. A3, first of all, gives express statutory authorization for the unit operator to sell a UMO's share of gas. That was uncertain before the existence of A3, and that's the whole discussion about is this conversion, is this a breach of a quasi-contractual obligation? A3's enactment stopped that discussion. It says you have express statutory authority to sell the share of gas that belongs to the UMO if they haven't made their own arrangements to do so. The second thing that A3 does is it puts into effect a system of cash balancing versus in-kind. The normal default rule in Louisiana is that balancing is done in-kind, a share of production. The operator can leave production in the ground and say, you'll get your share later. With respect to the UMO now, when the operator chooses to sell unit production, it is effectively selling the share of the UMO as well and is required to account in cash. That's really what proceeds means in the context of A3. It means cash. I hope that answers the question in terms of what they do. Now, I'm going to try not to rehash what Ms. Roland-Ogden went through. It is our position as well in terms of the wealth of authority under Louisiana law that establishes that the relationship of negotio am gestio is created when the operator sells production. I do want to address more specifically there the concept of matter of law. It is our position that that happens as a matter of law under this wealth of case law that Ms. Roland-Ogden discussed. The plaintiffs are making two different sets of arguments now against that. One is that certain legal requirements of the doctrine of negotio am gestio are not satisfied by the operator's sale of the share of production of the UMO. The second argument relates to this concept of whether there are issues of material fact that the court must consider in Chesapeake and BPX must prove relating to their intent.  So for both of those sets of arguments, I'll note, as we did in our briefs, that they weren't raised below and are waived on that basis alone. But let's just talk about them on the merits to get that out of the way. The first set of arguments relating to the requirements of negotio am gestio not being satisfied, those are subsumed by the cases we've already discussed. Those requirements existed when those Louisiana Court of Appeal cases stated that negotio am gestio applies when there's a sale of production. That's the only thing they asked about when there's a sale of production. Obviously, they're over the concept that there's any kind of a bar in the negotio am gestio statutes that would prevent that from happening. Now, with respect to the issue of the material facts, again, not one of those cases raised a question about intent or anything like that. And some of those cases applied where the operator even denied the UMO's rights, never paid a penny of proceeds. Right here, there's no doubt that Chesapeake has paid share of proceeds. The question is whether they've paid all proceeds because of the deduction of the PPCs. But even the Wells and the Smith cases that we've talked about show you that—I'm sorry, not the Wells case, the King v. Stroik case—apply negotio am gestio even when nothing has been paid because it's not conversion. The reason here is the central reason that the plaintiffs are ignoring. In this case, 10A3, there's express statutory authority to sell the UMO's share of gaps. Nobody disagrees with that in this case. Once you have that express statutory authority to sell, you've basically taken this out of the normal kind of asking whether there's intent or anything like that. We're saying, you have a right to sell, so you cannot, by definition, be a usurper. You cannot, by definition, convert. This is another reason why it's not dictative. Those courts are weighing prescriptive periods. Here's a conversion period of one year. Here's a 10-year period for your UMO. What they say is, because you have, as the unit operator, that right to sell, you're not a converter. That's why we're in contract world. When I don't pay the $1,000 I owe on a contract, the police don't come arrest me. I'm not a converter at that stage. I'm a breacher. That's what we're talking about in this scenario, too. There are rights and obligations, a relationship. We're not usurpers and can't be, and there's no factual predicate that has to be laid other than the fact that the unit operator sold unit production. That's it. Does this leave the UMOs unprotected? It does not. Why not? Because there are obligations in a relationship. The obligations on the unit operator, prudent administration, charges need to be necessary and useful. The district court left that open specifically in this case for the plaintiffs to come back and prove. We're just talking about theoretically. There's also one really big protection here that nobody's really talking about too much, which is that they have the right to take in kind still. They don't have to market with us. They don't have a choice in the 10A2 setting where the unit operator is going to drill. They don't have an option there. Here they do. Are there rights that BPX being able to engage in self-dealing would be required to give notice to owners that had undertaken management decisions, wait for directions? Is this the kind of rights that they would have? I think some of those rights might have been provided for account for proportionate share of profits by virtue of the managed affairs. I'm not going to agree with every single one, but those are some of the litany of the normal rights that you would have. The main rights are prudent administrator standard, which cabins the conduct of the unit operator, and the fact that these costs need to be necessary and useful. You look at the particular contract and then there's statutory requirements to make sure that they would have some rights. They're not just being rolled over. That's exactly correct. Again, they also have the option not to market with us at all. They can enter into a contract with somebody else who's perhaps taking in kind from that, well, hey, take our stuff, put it with yours. They can do that. Another thing to think about is we talk about these UMOs as if they're all very unsophisticated persons who are roped into this deal. That's true for some of them, but it's not true for all of them. There are many very, very sophisticated parties who become UMOs by choice. It's a way. You're looking at the economics of the well and you're making a bet. Do I want to take this big lease bonus or small lease bonus and the royalty without having to pay a share of production costs or whatever, versus I'm going to bet that this well is going to pay out fairly quickly and I'm going to ride that out, pay that share, and then I get 100 percent, eight-eighths interest. It's an economic decision. We don't have a situation where every single person needs this level of protection. But even if we did, the civil codes shows us that the negosiorum gestio doctrine applies to people even without legal capacity. So it's not dependent upon the level of capacity of the person who's being managed. It's simply dependent upon somebody managing someone else's. The bottom line here is I think the concept of eerie. We have these laws. We have the free ride deal. Every policy in Louisiana, both in A2 and in co-ownership and the other civil code doctrines requires the payment of costs. This one is no different and there's no reason to believe otherwise. Thank you. Thank you. Thank you, Your Honor. I'm glad my friend Ms. Duarte stated this because it focuses the issue. She says that the plain text of Civil Code Article 2292 is subsumed by case law. That's not civilian doctrine. This is Louisiana. Case law cannot overcome plain language of a civil code article. Civil Code Article 2292 defines a gestio relationship. It says it exists only when a person, the manager, acts without authority to protect the interests of another. There's your intentionality requirement right there as Louisiana Supreme Court recognized in Kirkpatrick in 1994. And he does so in the reasonable belief that the owner would approve of the action if made aware of the circumstances. This is the civil code. Dicta in Third Circuit decisions by the Civil Code Articles. Comment C puts this point really clearly. Kirkpatrick v. Young, 1984. A person doesn't qualify unless he undertakes the management with the benefit of the owner in mind. It's in the civil code. It's in Louisiana Supreme Court. Comment D. The article does not apply when the person who undertakes management acts in his own interest or contrary to the actual or presumed intention of the owner. It does not apply. It has to be based on a fact determination that these factual predicates apply. The Louisiana Supreme Court in Wells v. Zadig didn't dispense with this. They did not mention negotio or gestio at all. Instead, they made the point we agree with. This is based on a quasi-contractual obligation. Section 8.3 sets forth a quasi-contractual obligation. It's quasi-contractual because there's no contract. We agree. The whole thing is about the absence of a contract. Section 8.3 sets forth our payment basis. It is our royalty clause by law with the operator. There is no contract, so therefore it must be quasi-contractual. You can read Litvinov and Scolese, and you can see when you're making a prescriptive period determination, you have to put the source of an obligation to one or four or five boxes. Contract, quasi-contract, delict, quasi-delict, and sometimes you call it at-law legal servitudes. The only box that this can go into is quasi-contract. But all quasi-contracts, all negotio and gestio obligations are quasi-contracts. Not all quasi-contracts are negotio and gestio. This is throughout the civil code. Otherwise, the concept of a usurper wouldn't make sense. If a usurpation is not possible, as my friend Ms. Duarte says, then this can't be gestio because there's no facts. And the Louisiana Supreme Court has repeatedly affirmed the plain language of Article 2292. It depends on facts related to intent and objective conduct. I can tell you right now, my clients do not approve of the actions taken by the operators in this case. These do not accord with the actual or presumed intentions of my clients. That's the law. It cannot be subsumed. There is no automatic gestio. The Louisiana Supreme Court did not say that in Wells v. Sattick. It simply said this is quasi-contract. That's the end of the story. What does A-3 do? I believe Judge Elrodge asked that or perhaps it was Judge Ho. A-3, as my friends on the other side says, it sets forth the payment to the unleased owner. That's proceeds. That proceeds is a different basis of payment than market value. The Louisiana legislature was aware of this in 1984. They could have written Section A-3 to say the unleased owner shall be paid the market value or the net back value or the value free of these costs. Instead, they elected to use proceeds, which just about every scholar on oil and gas, every court on Louisiana oil and gas and around the country recognizes proceeds as a specific meaning. In fact, one of the cases you referenced in the oral argument before us, the Anderson Family Trust case, the court there said that the word custom and usage, proceeds and gross proceeds, means the same thing. According to my friends on the other side in the district court, Section A-3 could have said gross proceeds and it wouldn't have made any difference because Article 2297 would apply unless Louisiana legislature said 2297, which had never been applied here, does not apply. This is a burden on the legislature to anticipate that one day someone would say, well, gestio applies, and automatically based on zero facts, departing from 200 years of jurisprudence saying this is a fact-specific determination that never occurs automatically. Thank you. Thank you, sir. That concludes our oral arguments for today. This is argued to be tomorrow at 1 p.m. tomorrow.